**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

<table>
<tr><td>

IN RE *EX PARTE* APPLICATION OF
Ibiuna Crédito Gestão de Recursos Ltda., Travessia
Securitizadora de Créditos Financeiros S.A. and Travessia
Securitizadora de Créditos Financeiros XXXII S.A.

*Petitioners,*

For an Order Pursuant to 28 U.S.C. § 1782 to Take
Discovery for use in Foreign Proceedings in the Federal
Republic of Brazil.

</td><td>

Case No. 24-MC-0013

</td></tr>
</table>

**MEMORANDUM OF LAW IN SUPPORT OF PETITIONERS' *EX PARTE*
APPLICATION AND PETITION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 TO
TAKE DISCOVERY FOR USE IN FOREIGN PROCEEDINGS IN THE FEDERAL
REPUBLIC OF BRAZIL**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ...................................................................................1

I.    FACTUAL BACKGROUND ...........................................................................3

    A.    The Parties .......................................................................................3

    B.    Relevant Non-Parties .....................................................................4

    C.    Starbucks' Operations in Brazil, and Mr. Pope's Takeover of Them....................5

    D.    The Petitioners and their Relationship with SouthRock and Mr. Pope .................8

        1.    The Commercial Notes Issued to the Petitioners by Starbucks Brazil and by Wahalla...................................................9

        2.    Starbucks Brazil and Wahalla Defaults on their Obligations under the Commercial Notes and file for Judicial Reorganization.......10

        3.    The Significant Misrepresentations by Mr. Pope .......................12

    E.    The Foreign Proceedings ..............................................................13

        1.    The Brazilian Civil Proceedings .................................13

        2.    The Brazilian Criminal Investigation.................................15

    F.    Respondents Possess Highly Material Information for Use In The Foreign Proceedings.................................................15

II.    ARGUMENT ..............................................................................................17

    A.    Legal Framework ..........................................................................17

    B.    Petitioners Satisfy the Statutory Requirements Of 28 U.S.C. § 1782...................19

        1.    Respondents "Reside" or are "Found" In The Southern District Of New York.................................20

        2.    The Discovery Sought Is For Use In Foreign Proceedings.......................20

        3.    Petitioners Are "Interested Persons."........................................22

    C.    All Of The Discretionary Factors Of Section 1782 Weigh In Favor of Permitting The Discovery Petitioner Seeks. ..........................................22

        1.    The First Intel Factor Favors Granting Discovery Because Respondents Are Not Parties to the Foreign Proceedings. .......................23

        2.    The Second Intel Factor Favors Granting Discovery Because the Brazilian Courts Will Be Receptive to the Requested Discovery.............23

        3.    The Third Intel Factor Favors Granting Discovery Because The Application Is Made in Good Faith and Does Not Circumvent Any Proof-Gathering Restrictions. ..................................25

        4.    The Fourth Intel Factor Favors Granting Discovery Because The Requests Are Narrowly-Tailored and Proportional To The Needs

           Of The Foreign Proceedings. ...................................................................26

III.     CONCLUSION......................................................................................................27

# **TABLE OF AUTHORITIES**

**Page(s)**

## **Cases**

*In re Accent Delight Int'l Ltd.*,
  869 F.3d 121 (2d Cir. 2017)................................................................................ 20

*In re Application for an Order Permitting Metallgesellschaft AG to take Discovery*,
  121 F.3d 77 (2d Cir. 1997)........................................................................... 18, 24

*In re Application of OOO Promnesftstroy*,
  No. M 19-99(RJS), 2009 WL 3335608 (S.D.N.Y. Oct 15, 2009) ......................... 22

*Australia & New Zealand Banking Grp. Ltd. v. APR Energy Holding Ltd.*,
  No. 17-MC-00216(VEC), 2017 WL 3841874 (S.D.N.Y. Sept. 1, 2017) ............... 19

*In re Bayer AG*,
  146 F.3d 188 (3d Cir. 1998)......................................................................... 17, 25

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
  673 F.3d 76 (2d Cir. 2012) ................................................................... 17, 20, 24

*In re Edelman*,
  295 F.3d 171 (2d Cir. 2002)................................................................................ 18

*Euromepa, S.A. v. R. Esmerian, Inc.*,
  51 F.3d 1095 (2d Cir. 1995).......................................................................... 18, 23

*In re Gianoli Aldunate*,
  3 F.3d 54 (2d Cir. 1993)..................................................................................... 17

*In re Gushlak*,
  No. 11-MC-218 NGG, 2012 WL 1514824 (E.D.N.Y. Apr. 30, 2012)................... 17

*Hertz Corp. v. Friend*,
  559 U.S. 77, 93 (2010)....................................................................................... 19

*Intel Corp. v. Advanced Micro Devices, Inc.*,
  542 U.S. 241 (2004).................................................................................. *passim*

*Inv. Vehicles v. KPMG, L.L.P.*,
  798 F.3d 113 (2d Cir. 2015)................................................................................ 21

*In re Klein*,
  No. 20-MC-203(PKC), 2022 WL 14786787 (S.D.N.Y. Oct. 26, 2022)................. 20

*In re Lane*,
  No. 22 MISC. 34(LGS), 2022 WL 16737132 (S.D.N.Y. Nov. 7, 2022) ......... 19, 20

iv

*Mees v. Buiter*,
    793 F.3d 291 (2d Cir. 2015).................................................................................. 3

*Minatec Fin. S.A.R.L. v. SI Group Inc.*,
    No. 1:08-cv-269 (LEK/RFT), 2008 WL 3884374 (N.D.N.Y. Aug. 18, 2008)..................... 25

*In re Pimenta*,
    942 F. Supp. 2d 1282 (S.D. Fla. 2013) ............................................................... 20

*In re Tethyan Copper Co. Pty. Ltd.*,
    No. 21 MISC. 377(AT), 2022 WL 1266314 (S.D.N.Y. Apr. 28, 2022)............................... 17

## **<u>Statutory Authorities</u>**

28 U.S.C. § 1782................................................................................................. *passim*

Petitioners Ibiuna Crédito Gestão de Recursos Ltda. ("Ibiuna"), Travessia Securitizadora de Créditos Financeiros XXXII S.A.,("Travessia XXXII") and Travessia Securitizadora de Créditos Financeiros S.A. ("Travessia") (collectively, the "Petitioners") respectfully submit this Memorandum of Law in support of their *ex parte* Application and Petition (the "Application") pursuant to 28 U.S.C. § 1782 ("Section 1782"), for an order authorizing Petitioners to obtain limited discovery from Goldman Sachs Group Inc. ("Goldman Sachs Group"), Goldman Sachs & Co. LLC ("Goldman Sachs"), Santander Bank, N.A. ("Santander"), The Clearing House Payments Company LLC ("CHIPS"), and the Federal Reserve Bank of New York ("NY Federal Reserve") (together the "Respondents") for use in judicial proceedings pending in Brazil, in the form of the attached subpoenas *duces tecum* (the "Subpoenas").[1]  A proposed order to grant Petitioners' Application is attached hereto as Exhibit B (the "Proposed Order").

## PRELIMINARY STATEMENT

This Application arises from foreign civil and criminal proceedings pending in Brazil concerning the business operations of Starbucks and Subway in that country, held through the SouthRock Group, a group of U.S. and Brazilian companies controlled and owned by Kenneth Steven Pope.  The facts relevant to this Application are set forth below and in the accompanying Declaration of Petitioners' local Brazilian attorney, José Luiz Bayeux,[2] filed contemporaneously herewith (the "Bayeux Declaration").  The facts stated in the Bayeux Declaration are fully incorporated herein by reference and provide a much more detailed background than the summary that follows.

---

[1] The Subpoenas are attached hereto as Exhibit A.
[2] The Declaration of Jose Luis Bayeaux ("Bayeux Decl."), dated January 5, 2024, together with its attachments, is attached hereto as Exhibit C.

The purpose of this Application is to gather evidence in the Southern District of New York for use in two civil proceedings, in addition to a judicial reorganization proceeding, and a criminal investigation—the civil proceedings and criminal proceeding were initiated by the Petitioners in the State of São Paulo, Brazil; the judicial reorganization proceeding was filed by Starbucks Brazil Ltda. and other companies, and Petitioners are parties.[3,4]  The discovery sought consists of financial records from banks and other financial institutions that hold accounts and/or process payments for Mr. Pope and/or his companies that are incorporated in the United States and that are involved in the operations of the SouthRock Group in Brazil.

Under Brazilian law, the Petitioners have a duty to investigate and identify a defendant's assets to satisfy the total debt owed and to proceed with their attachment or garnishment.  Therefore, the evidence will be used to show that (i) Mr. Pope and his companies have assets in the United States either though investments and/or bank accounts; and (ii) Mr. Pope, despite being the personal guarantor of the loan of R$116 million Brazilian Reais (equivalent to US $24 million), granted by the Petitioners, might have transferred funds to and concealed assets located in the United States with the intent of defaulting on the payment of such financing, as well as the payment of the debts listed in the SouthRock Group's judicial reorganization proceeding pending in the São Paulo State Court.[5]

This Application meets the requirements of Section 1782.  Respondents "reside or are found" in the Southern District of New York because they are either headquartered here or have

---

[3] The two civil proceedings, the judicial reorganization, and the criminal organization as together referred to as the "Foreign Proceedings."

[4] *See* Bayeux Decl., ¶9.

[5] Bayeux Decl., ¶10.

their principal place of business here.  The discovery sought by the Petitioners is highly material and relevant to the issues at stake in the Foreign Proceedings.  Moreover, each of the discretionary factors laid down in the Supreme Court's *Intel Corp. v. Advanced Micro Devices, Inc.,* 542 U.S. 241 (2004) decision favors authorizing the discovery sought by the Petitioners: (i) Respondents are not parties to the foreign proceedings, and the Petitioners are otherwise unable to obtain the discovery in Brazil; (ii) the Brazilian courts will be receptive to discovery that the Petitioners seek; (iii) the Application does not circumvent foreign proof-gathering restrictions and is made in good faith; and (iv) the discovery sought is neither unduly intrusive nor burdensome.  In addition, granting this Application would further the "twin aims" of Section 1782: "providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts."[6]  Accordingly, the Petitioners respectfully request that the Court grant Petitioners' Application and permit the Petitioners to serve the Subpoenas on Respondents.

## I.      FACTUAL BACKGROUND

### A.      The Parties

*Ibiuna Crédito Gestão de Recursos Ltda.*  Ibiuna was founded in 2010 as an independent asset management firm.  As of today, Ibiuna has over 29 billion Brazilian Reais in assets under management split in three areas: MACRO; EQUITIES; and CREDIT.  Ibiuna is registered with the Brazilian securities and exchange commission, *Comissão de Valores Mobiliários*, or CVM. *See* Ibiuna's website at www.ibiunainvest.com.br.[7]

---

[6] *Mees v. Buiter*, 793 F.3d 291, 297–98 (2d Cir. 2015).
[7] Bayeux Decl., ¶21.

***Travessia Securitizadora de Créditos Financeiros XXXII S.A. and Travessia Securitizadora de Créditos Financeiros S.A.***  Travessia was founded in 2016 as a company that specializes in securitization.  It connects corporations in need of credit (money) with the proper credit providers (lenders).  Travessia is registered with the CVM.  *See* Grupo Travessia's website at www.grupotravessia.com.[8]

***Santander.***  Santander is one of the country's largest retail and commercial banks.[9] Santander is principally located in this District.  Santander acted as financial services provider to Mr. Kenneth Pope and to his companies.[10]

***CHIPS.***  CHIPS is a financial services institution headquartered in New York, New York. CHIPS acts as clearinghouse bank for U.S. dollar-denominated wire transfers between domestic and international banks.[11]

***Federal Reserve Bank.***  The Federal Reserve Bank is a bank headquartered at 33 Liberty Street, New York, NY 10045.  As a provider of the Fedwire Funds Service through its Wholesale Product Office, the Federal Reserve Bank also acts as a wire-transfer clearing house for U.S. dollar-denominated wire transfers between domestic and international banks.[12]

**B.    Relevant Non-Parties**

***Kenneth Steven Pope.***  Mr. Pope is an American citizen who owns and/or controls the SouthRock Group, which comprises U.S. entities and entities incorporated in Brazil.  Mr. Pope is the founder and Chief Executive Officer of the SouthRock Group, which holds exclusive rights

---

[8] Bayeux Decl., ¶22.
[9] *See* www.santanderus.com/about-us/.
[10] Bayeux Decl., ¶60.
[11] Bayeux Decl., ¶62.
[12] Bayeux Decl., ¶63.

for the use and exploitation, in Brazil, of globally renowned brands in the food and beverage market, such as Starbucks, Subway, TGI Fridays and Eataly. [13]

**SouthStone Capital LLC.**  SouthStone Capital is a U.S. entity incorporated in Frisco, Texas, whose agent is Mr. Pope.  SouthStone is controlled by Mr. Pope and is the majority shareholder of SouthRock Capital Ltda.[14]

**SouthRock Group.**  The group holds exclusive rights for the use and exploitation, in Brazil, of globally renowned brands in the food and beverage market, such as Starbucks, Subway, TGI Fridays and Eataly, and is comprised of the following, among other companies: Starbucks Brasil Comércio de Cafés Ltda. ("Starbucks Brazil"); SouthRock Capital Ltda. ("Southrock Brazil"); Wahalla Ltda. ("Wahalla"); SRC 5 Participações Ltda. ("SRC 5"); SR N Participações S.A. ("SR N"); and Subway do Brasil Ltda. ("Subway Bazil").[15]

### C.     Starbucks' Operations in Brazil, and Mr. Pope's Takeover of Them

The first Starbucks store in Brazil opened on December 1, 2006, in São Paulo.  The original Starbucks stores were operated by Starbucks Coffee International, Inc. ("Starbucks USA").  Starbucks USA operated its Brazilian units through Starbucks Brazil, which was incorporated as a limited liability company in Brazil on May 10, 2006.  At the time of its incorporation and through March 2018, Starbucks Brazil was controlled by Starbucks USA.  On March 23, 2018, Starbucks Brazil and SBI Nevada, Inc., an affiliate of Starbucks USA, entered into two agreements with Starbucks Brazil: a Trademark and Technology License Agreement (the Trademark Agreement"); and an Area Development and Operation Agreement (the "Operation Agreement").  The two

---

[13]  Bayeux Decl., ¶¶7, 11.
[14]  Bayeux Decl., ¶¶14, 15.
[15]  Bayeux Decl., ¶¶7, 14.

Agreements granted Starbucks Brazil certain rights to construct and operate Starbucks stores, to sell core products of Starbucks, and to conduct the Starbucks system in Brazil.[16]

After the Trademark Agreement and the Operation Agreement were signed on March 23, 2018, Starbucks Brazil's ownership was transferred from Starbucks USA to Star Participações S.A. ("Star") (99.9%) and SouthRock Brazil (0.1%).   The ultimate majority owner of Star and SouthRock Brazil is Mr. Pope.[17]   Mr. Pope has thus controlled Starbucks Brazil through his 100% ownership of American company SouthStone, which in turn owns a majority interest in SouthRock Brazil (SouthRock Capital Ltda.), which owns a majority interest in Star, which owns 99.9% of Starbucks Brazil.   After taking control of Starbucks Brazil, Mr. Pope rapidly started to expand its business, which, at one point, included 187 Starbucks stores.[18]   The SouthRock Group also includes a company named Wahalla, a limited liability company incorporated under the laws of Brazil.[19]   Wahalla is the technology vehicle under SouthRock Brazil responsible for operating the apps and other technology for Starbucks and Subway stores in Brazil.[20]

As of 2020, Mr. Pope decided to leverage his business through multiple secured debt transactions—borrowing money from private investors in secured loan transactions or through the issuance of commercial notes, payable to creditors using him and/or his controlled companies (that pertain to the SouthRock Group) as a personal guarantor.   In approximately thirty months, from January 2021 through June 2023, Mr. Pope borrowed R$ 800 million reais, the equivalent of US

---

[16]   Bayeux Decl., ¶13.
[17]   Bayeux Decl., ¶14.  *See* corporate organizational chart along with ownership stakes of Star and SouthStone Capital Ex. E to the Bayeux Decl.
[18]   Bayeux Decl., ¶15.
[19]  Wahalla is ultimately owned by SouthRock Brazil, which is majority owned by Mr. Pope's American company, SouthStone.  *See* Bayeux Decl., ¶16.
[20]   Bayeux Decl., ¶16.

$160 million, from different creditors in Brazil.[21]  For the Petitioners, the Starbucks and Subway names were crucial to the debt transactions, especially given the size of the Brazilian market (approximately 215 million people) and the representations made by Mr. Pope concerning his companies and bold business plans for expansion.  However, Mr. Pope, in a desperate hunt for cash and at the verge of filing a judicial reorganization proceeding in Brazil on behalf of his SouthRock Group, misrepresented financial statements to the Petitioners, and he concealed bonds and other types of debt that had been issued by Starbucks Brazil, as well as by Wahalla and other affiliates of SouthRock Brazil just months before contacting the Petitioners.[22]

The frenetic borrowing only ended on October 31, 2023, when twenty-two of the SouthRock Group's Brazilian companies (including Starbucks Brazil and Wahalla) filed for judicial reorganization in Brazil (the "Brazilian Judicial Reorganization Proceeding").  Petitioners only learned the full picture of Mr. Pope's and his companies' extreme indebtedness a few months prior to the filing of the Brazilian Judicial Reorganization Proceeding.  At present, the Starbucks stores in Brazil are deteriorating (some even lack water to continue their operations), various creditors of Mr. Pope and his companies dispute what is left of the business, and the Brazilian Judicial Reorganization proceeding is nowhere near its end.[23]

Nevertheless, Petitioners have a claim against Mr. Pope, Starbucks Brazil, Wahalla, SouthRock Brazil, and other affiliated companies for over R$ 110 million Brazilian Reais, (approximately $ 22 million) based on an enforceable instrument, and may proceed directly to collection of the debt through the civil proceedings, or the enforcement proceedings (or "*ação de*

---

[21]  Bayeux Decl., ¶17.
[22]  Bayeux Decl., ¶18.
[23]  Bayeux Decl., ¶19.

*execução*") under articles 771 and following articles of the Brazilian Civil Procedure code.[24] Enforcement of that judgment may proceed forthwith and is not stayed by the Brazilian Judicial Reorganization Proceeding because Mr. Pope himself and other companies of the SouthRock Group are personal guarantors of the commercial notes issued by the Petitioners and are not part of the companies that filed for judicial reorganization.   Thus, under Brazilian law, the civil enforcement proceeding, and related proceedings fall outside the scope of the the Brazilian Judicial Reorganization Proceeding.[25]

### D.    The Petitioners and their Relationship with SouthRock and Mr. Pope

In or around August 2022, Mr. Pope was introduced to the Petitioners through SouthRock's Chief Financial Officer, Mr. Fabio Rohr.   Mr. Pope was looking to raise capital through the issuance of commercial notes purportedly to continue expanding SouthRock's operations.   After multiple meetings with the Petitioners, and the due diligence process, which consisted of a thorough review of the financial statements of SouthRock Brazil and affiliated companies, the Petitioners decided to lend R$116 million Brazilian Reais (an equivalent of $24 million) to Starbucks Brazil and to Wahalla through the issuance of two sets of commercial notes.   The first was issued on November 1, 2022 (the "November 2022 Commercial Notes"), and the second was issued on December 14, 2022 (the "December 2022 Commercial Notes") (together, the "Commercial Notes").[26]

During the Petitioners' due diligence process, the Petitioners requested several documents from Mr. Pope and his business, especially financial information concerning Starbucks Brazil and

---

[24]   Brazilian Federal Law No. 13,105 dated March 16, 2015.
[25]   Bayeux Decl., ¶20.
[26]   Bayeux Decl., ¶23.

its affiliated companies.  Mr. Pope, SouthRock Group's lead accountant Mr. Marcos Carvalho, his legal team and Mr. Fabio Rohr exchanged numerous communications with the Petitioners.  As will be explained further below, Mr. Pope and his executives concealed material information from the Petitioners, such as the accurate level of indebtedness of Starbucks Brazil, its affiliates, and other companies controlled by Mr. Pope.[27]

     *1.*     *The Commercial Notes Issued to the Petitioners by Starbucks Brazil and by Wahalla*

On November 1, 2022, Starbucks Brazil issued the November 2022 Commercial Notes through a structured finance securitization in which Starbucks Brazil issued 75,000 commercial notes at a nominal value of one thousand Brazilian Reais each, to borrow a total of 75 million Brazilian Reais from Banco Daycoval, or an equivalent of US $16 million.  To borrow such a significant amount, Starbucks Brazil committed to pay Banco Daycoval 48 fixed monthly installments, the first due on November 6, 2022, and the last on October 6, 2026.  On the same date, November 1, 2022, Banco Daycoval assigned its credit rights related to the Commercial Notes to the Petitioners.[28]

On December 14, 2022, Wahalla, an affiliate of SouthRock Brazil, issued the December 2022 Commercial Notes through a structured finance securitization in which Wahalla issued 41,000 commercial notes at a nominal value of one thousand Brazilian Reais each, to borrow a total of 41 million Brazilian Reais from Banco Daycoval, or an equivalent of US $8 million.  To borrow such a significant amount, Wahalla committed to pay Banco Daycoval sixty fixed monthly installments, the first due on January 6, 2023, and the last on December 6, 2027.  On the same date,

---

[27]  Bayeux Decl., ¶24.
[28]  Bayeux Decl., ¶¶25-26.

December 14, 2022, Banco Daycoval assigned its credit rights related to the Commercial Notes to Petitioner Travessia Securitizadora de Créditos Financeiros XXXII S.A.[29]

Under Article 48 of Brazilian Federal Law No. 14,195 issued on August 26, 2021, a commercial note is an extrajudicial enforceable title (*título executivo extrajudicial*) and creates a legal presumption that a certain sum debt exists by its holder simply with a certificate issued by a registrar or by a central depository.  In other words, the creditor is not required to seek recognition of the debt under Brazilian law through a recognition proceeding and then proceed with the liquidation process.  Instead, a creditor may simply attach the certificate with an initial complaint for payment.  Once such a judgment is enforceable under Brazilian law, the creditor has an expedited proceeding in Brazilian courts to seek payment of the debt.  Thus, there is a presumption that the Petitioners are owed the debt, in addition to default interest, monetary adjustment, and attorney's fees**.**[30]

Mr. Pope and SouthRock Brazil are personal guarantors of both Commercial Notes.  Under Article 818 of the Brazilian Civil Code, a personal guarantor is liable for the entirety of a third-party debt, and his liability is not limited by the type of assets he owes.  All assets owned by the personal guarantor can be attached to satisfy the debt.[31]

> 2.   *Starbucks Brazil and Wahalla Defaults on their Obligations under the Commercial Notes and file for Judicial Reorganization*

On September 6, 2023, Starbucks Brazil defaulted on its monthly fixed payment under the November 2022 Commercial Notes.  No other payments have been made on the Notes since then.

---

[29]   Bayeux Decl., ¶¶27-28.
[30]   Bayeux Decl., ¶29.
[31]   Bayeux Decl., ¶30.

Under Section 6.2, the acceleration clause of the November 2022 Commercial Notes issuance term, a default accelerates the remainder of all fixed monthly instalments. On September 9, 2023, Wahalla defaulted on its monthly fixed payment under the December 2022 Commercial Notes. No other payments have been made on the Notes since then. Under Section 6.2, the acceleration clause of the December 2022 Commercial Notes issuance term, a default accelerates the remainder of all fixed monthly instalments. On October 31, 2023, Starbucks Brazil, SouthRock Brazil, and other companies controlled by Mr. Pope filed the Brazilian Judicial Reorganization Proceeding. According to media reports, the SouthRock Group has a debt estimated at 1.8 billion Brazilian Reais.[32]

The Petitioners repeatedly tried to negotiate alternative payment solutions before the judicial reorganization and before filing judicial proceedings. In fact, prior to the September 2023 default, the Petitioners agreed to roll over the monthly payments twice. During this time, the Petitioners sought additional collateral from Mr. Pope to further back up the payments. Indeed, Petitioner Ibiuna repeatedly requested evidence of any collateral that Mr. Pope could give to back his debt with the Petitioners.[33]

However, he reported that his apartment was mortgaged, and that he had no other assets that were free of liens. The only liquid funds that Mr. Pope claimed to have were allegedly in a 401(k) retirement plan that Mr. Pope purportedly owned through his employment with Riata Corporate Group, LLC, a company that is controlled by Mr. Pope's family. During an August 11, 2023, Microsoft Teams meeting between representatives of Petitioner Ibiuna and Mr. Pope, Mr.

---

[32] Bayeux Decl., ¶¶32-34.
[33] Bayeux Decl., ¶35.

Pope displayed for Ibiuna a screenshot of an alleged $5 million withdrawal that he had made from the purported 401(k) plan—in an effort to show that he had funds to pay his debts.  Mr. Pope also informed Ibiuna, both during the Microsoft Teams meeting and in several prior instances, that he is the beneficiary of a trust established by his parents, "the Pope Terry D & Barbara A The Pope 2007 Revoc Trust," and that the trust was worth approximately $300 million.  Mr. Pope also made this representation to representatives of Travessia on prior occasions.[34]

Despite these representations, Mr. Pope offered no cash or further collateral to the Petitioners, and, after the Brazilian Judicial Reorganization Proceeding was filed, the Petitioners had no other options but to file judicial proceedings against Mr. Pope and his companies in Brazil. The Petitioners filed two civil proceedings with the São Paulo State Court, one on November 16, 2023, concerning the November 2022 Commercial Notes, and the other on December 5, 2023, regarding the December 2022 Commercial Notes (the "Brazilian Civil Proceedings").

### 3.    The Significant Misrepresentations by Mr. Pope

In September 2022, one month before the Petitioners lent Starbucks Brazil 75 million Brazilian Reais, Mr. Marcos Carvalho, SouthRock Group's lead accountant, sent to the Petitioners Starbucks Brazil's financial statements for the period ending on June 30, 2022.  As of June 30, 2022, Starbucks Brazil's true debt load was not 263,79 million Reais, as reported by Starbucks Brazil to the Petitioners, but, at the very least, 310 million Reais.[35]

Also in the Brazilian Judicial reorganization proceedings, the Petitioners learned that Mr. Pope, Mr. Carvalho, and Mr. Fabio Rohr concealed non-operational companies from SouthRock

---

[34]  Bayeux Decl., ¶¶36-37.
[35]  Bayeux Decl., ¶¶44-47.

Brazil's corporate organizational chart.  Additionally, Mr. Pope and his executives manipulated the amount that Mr. Pope's companies owed to Starbucks USA in royalties.[36]

### E.    The Foreign Proceedings

*1.    The Brazilian Civil Proceedings*

On November 16, 2023, and on December 5, 2023, Petitioner Travessia Securitizadora de Créditos Financeiros XXXII S.A. filed civil proceedings (*ação de título extrajudicial*) against Mr. Pope and his companies in Brazil (the "Brazilian Civil Proceedings").[37,38]  The First Brazilian Civil Proceeding seeks payment of the balance of the Commercial Notes issued on November 1, 2022, which were personally guaranteed by Mr. Pope and SouthRock Brazil.  The outstanding balance to be paid by Mr. Pope and SouthRock Brazil is 71,543,656 Brazilian Reais.   On November 27, 2023, the São Paulo State Court ordered that Mr. Pope and the other defendants be served with process and that they must pay the debt within three business days of service.

The second civil proceeding is against Wahalla, Mr. Pope, SouthRock Brazil, SRC 5, SR N, and Subway do Brasil Ltda.; it is also pending in the São Paulo State Court.[39]  The Second Brazilian Civil Proceeding seeks payment of the balance of the Commercial Notes issued on December 14, 2022, which were personally guaranteed by Mr. Pope and SouthRock Brazil.  The outstanding balance to be paid by Mr. Pope and SouthRock Brazil is 43,181,537 Brazilian Reais.  On December 7, 2023, the São Paulo State Court ordered that Mr. Pope be served with process

---

[36]   Bayeux Decl., ¶¶48-50.

[37]   Bayeux Decl., ¶¶51-52.

[38] The first civil proceeding is against Starbucks Brazil, Mr. Pope, and SouthRock Brazil; it is pending in the São Paulo State Court.  The civil proceeding was assigned to the 33rd Civil Chambers of the São Paulo State Court under number 1161693-64.2023.8.26.0100 (the "First Brazilian Civil Proceeding").

[39] The civil proceeding was assigned to the 38th Civil Chambers of the São Paulo State Court under number 1171445-60.2023.8.26.0100 (the "Second Brazilian Civil Proceeding").

and that Mr. Pope must pay the debt within three business days of service.  The court also ordered that a lien be placed on real estate bought by SRC 5 (one of Mr. Pope's non-operational holding companies) in Brazil that was given as a collateral on the debt[40].

As for the Brazilian Reorganization Proceeding, the discovery sought in the Section 1782 Application will be essential to prove whether Mr. Pope in fact concealed the existence of assets he might own in the United States (under his name or through shell companies) or the existence of funds he might have transferred to entities incorporated in the United States with the purpose of defaulting his debts in Brazil (concerning not only the Petitioners, but also the entirety of creditors who are part of the judicial reorganization proceeding pending before the São Paulo State Court).[41]

None of the assets listed in the Brazilian Judicial Reorganization Proceeding is located in the United States. Both apartments Mr. Pope owns and all the companies in which he has equity interest are located in Brazil.  However, there are material indications that Mr. Pope has been using his own companies to divert assets from the civil proceedings and from the Brazilian Judicial Reorganization Proceeding, to avoid payment of the debt.  Reference to potential fraudulent transfers can be extracted from the expert report prepared by the Brazilian Judicial Reorganization expert attached to the Bayeux Decl.[42]  Such transactions with related parties confirmed by the expert report show that fraudulent transfers, in fact, happened from companies listed in the Brazilian Judicial Reorganization Proceeding to companies of the SouthRock Group that are also controlled by Mr. Pope and that were not listed in the judicial reorganization request.  Additionally,

---

[40]  Bayeux Decl., ¶¶54-55.
[41]  Bayeux Decl., ¶63.
[42]   Bayeux Decl., ¶¶64-65.

the non-report of such companies impacts the personal guarantees offered by Mr. Pope and his companies to the Petitioners. [43]

### 2.    The Brazilian Criminal Investigation

On November 29, 2023, after learning the troubling information described above, the Petitioners filed a formal complaint with the Third Police Department for Financial and Economic Fraud Investigation for the São Paulo State Criminal Investigation Department (*3ª Delegacia de Polícia de Investigações sobre Fraudes Financeiras e Econômicas do Departamento Estadual de Investigações Criminais*) (the "Brazilian Criminal Authority") against Mr. Pope, Mr. Carvalho, and Mr. Rohr (the "Brazilian Criminal Procceding").

The Brazilian Criminal Proceeding focuses on the conduct of Mr. Pope and SouthRock Brazil's executives—Mr. Carvalho and Mr. Rohr—concerning the misrepresentations made by them to the Petitioners to induce them to lend money through the Commercial Notes, as well as misrepresentations made after their issuance, which were made by Mr. Pope to the Petitioners in a bid to obtain additional financing.

### F.    Respondents Possess Highly Material Information for Use In The Foreign Proceedings

The information Petitioners request in this Section 1782 Application from the Respondents will assist Petitioners to identify assets of the debtors that may be brought to the Brazilian courts' attention for possible satisfaction of the debts; and second, to identify and prove any fraudulent transfers that Mr. Pope, his companies, or employees/agents thereof may have made and that can be used to satisfy the debt.

---

[43]    Bayeux Decl., ¶68.

The Petitioners seek records from several financial institutions that the Petitioners have identified from the financial statements of SouthRock Brazil and/or the expert report from the Brazilian Judicial Reorganization Proceeding as either holding accounts, sending or receiving payments, and/or processing payments for Mr. Pope and/or his companies that are incorporated in the United States and Brazil, and that were involved in the operations of the SouthRock Group in Brazil. [44]  The discovery sought in the Section 1782 Application will be essential to show whether Mr. Pope, in fact, concealed the existence of assets he might own in the United States (under his name or through shell companies) or the existence of funds he might have transferred to entities incorporated in the United States with the purpose of defaulting his debts in Brazil (concerning not only the Petitioners, but also the entirety of creditors who are part of the judicial reorganization proceeding pending before the São Paulo State Court).[45]

As for Respondents Goldman Sachs Group and Goldman Sachs, the expert report in the Brazilian Judicial reorganization proceeding identified them as being involved in related-party transactions involving Mr. Pope's companies.  Indeed, a table in the report shows that SouthRock Brazil has a credit to receive from Goldman Sachs and from SouthRock USA.[46]  As for Santander, Mr. Pope himself provided documents and information to the Petitioners that identified the bank as the financial institution regularly used by Mr. Pope.  Indeed, these documents show numerous payments and other operations going through Santander.[47]

---

[44]  Bayeux Decl., ¶58.
[45]   Bayeux Decl., ¶69.
[46]  Bayeux Decl., ¶59.
[47]  Bayeux Decl., ¶60.

Respondents CHIPS and Federal Reserve Bank (as a provider of the Fedwire Funds Service through its Wholesale Product Office) are wire-transfer clearing houses located in this District that act as clearinghouse banks for U.S. dollar-denominated wire transfers between domestic and international banks.  As the U.S. entities that process and settle wire transfers between domestic and international banks, these Respondents almost certainly possess information relating to wire transfers from Mr. Pope, and the Brazilian and U.S. entities of the SouthRock Group.  Given Mr. Pope and his companies non-payment of several debts in Brazil, Mr. Pope may have concealed and diverted assets to the United States through his accounts or his companies accounts, and it is impossible for Petitioners to identify these transfers without obtaining discovery from CHIPS and the Federal Reserve Bank.

The Respondents are therefore likely to be in possession and control of information highly material to the Foreign Proceedings.  This information would be relevant to Petitioners' Brazilian claims, as further explained in the Bayeux Declaration filed in support of the 1782 Application.[48]

## II.    ARGUMENT

### A.    Legal Framework

Section 1782 of Title 28 of the United States Code permits United States District Courts to grant discovery for use in a pending or "reasonabl[y] contemplat[ed]" foreign proceeding.  *Intel*, 542 U.S. at 259.  The statute, in relevant part, states:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . . The order may be made . . . upon the application of any interested person.

---

[48] *See* Bayeux Decl., ¶¶56-62.

28 U.S.C. § 1782.

Applications under section 1782 are routinely decided by this Court on an *ex parte* basis.[49]
Such applications are based on "modest prima facie elements" in order to effectuate "Congress's
goal of providing equitable and efficacious discovery procedures." *In re Bayer AG*, 146 F.3d 188,
195 (3d Cir. 1998); *see also Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80
(2d Cir. 2012) ("[T]he statute has, over the years, been given 'increasingly broad applicability.'"
(citing *In re Gianoli Aldunate*, 3 F.3d 54, 57 (2d Cir. 1993)).

An application made pursuant to Section 1782 must satisfy three statutory requirements:
"(1) the person from whom discovery is sought resides (or is found) in the district of the district
court to which the application is made, (2) the discovery is for use in a foreign proceeding before
a foreign tribunal, and (3) the application is made by a foreign or international tribunal or any
interested person."  *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir.
2012).

After determining that the three statutory requirements are satisfied, courts must then
consider four discretionary factors in deciding whether to grant a Section 1782 application: (1)
whether the documents or testimony sought are within the foreign tribunal's jurisdictional reach,
and thus accessible absent Section 1782 aid; (2) the nature of the foreign tribunal, the character of

---

[49]   *See In re Tethyan Copper Co. Pty. Ltd.,* No. 21 MISC. 377 (AT), 2022 WL 1266314, at *1 (S.D.N.Y. Apr. 28, 2022) ("Courts routinely grant similar petitions ex parte"); *In re Gushlak*, No. 11-MC-218 NGG, 2012 WL 1514824, at *3 n.4 (E.D.N.Y. Apr. 30, 2012) (citing several cases, including from this district, and noting that "courts routinely grant § 1782 applications *ex parte*, limiting respondents' challenges to after the subpoena is served"); *In re Ex Parte Application of Porsche Automobil Holding SE for an Order Pursuant to 28 U.S.C. §1782 Granting Leave to Obtain Discovery for Use in Foreign Proceedings*, No. 15-MC-417 (LAK), 2016 WL 702327, at *1 n.3 (S.D.N.Y. Feb. 18, 2016) ("As typically or, at least, frequently is the case in § 1782 proceedings, leave to serve the subpoenas was granted *ex parte*, which is appropriate because all questions with respect to the propriety of the grant of leave and with respect to the content to the subpoenas are available to every subpoenaed party via a motion to quash or the defense of an application to compel compliance with the subpoenas.").

the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance; (3) whether the Section 1782 request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and (4) whether the subpoenas contain unduly intrusive or burdensome requests. *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264-65 (2004).

Moreover, courts in this circuit "evaluate discovery requests under section 1782 in light of the statute's twin aims of providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts." *Euromepa S.A. v. R. Esmerian*, Inc., 51 F.3d 1095, 1097 (2d Cir. 1995); *In re Application for an Order Permitting Metallgesellschaft AG to take Discovery*, 121 F.3d 77, 79 (2d Cir. 1997). Both the Supreme Court and the Second Circuit have acknowledged a Congressional intent to provide a liberal avenue to discovery in aid of foreign and international proceedings. *See, e.g.*, *Intel*, 542 U.S. at 247-48; *Brandi-Dohrn*, 673 F.3d at 80 ("[T]he statute has, over the years, been given increasingly broad applicability."); *In re Edelman*, 295 F.3d 171, 179-80 (2d Cir. 2002) ("In sum, Congress has expressed as its aim that the statute be interpreted broadly . . . .").

### B. Petitioners Satisfy the Statutory Requirements Of 28 U.S.C. § 1782.

Petitioners' 1782 Application satisfies the three statutory requirements of Section 1782: (1) Respondents reside or are "found" in the Southern District of New York; (2) the requested information is for use in the Foreign Proceedings; and (3) Petitioner is an "interested person" as the plaintiff in those foreign proceedings.

      1.     *Respondents "Reside" or are "Found" In The Southern District Of New York.*

Respondents reside or are "found" in this district because they are either headquartered in this district or maintain their principal place of business here. *Hertz Corp. v. Friend*, 559 U.S. 77, 81, 93 (2010) (holding that a corporation's principal place of business "should normally be the place where the corporation maintains its headquarters"); *Matter of Fornaciari for Order to Take Discovery Pursuant to 28 U.S.C. §1782*, No. 17MC521, 2018 WL 679884, at *2 (S.D.N.Y. Jan. 29, 2018) (noting that a corporation is found in the district where it is "essentially at home"); *Australia & New Zealand Banking Grp. Ltd. v. APR Energy Holding Ltd.*, No. 17-MC-00216 (VEC), 2017 WL 3841874, at *3 (S.D.N.Y. Sept. 1, 2017) ("[A] corporation is 'at home' for the purpose of constitutional due process only in a state that is the corporation's place of incorporation or its principal place of business.") (*quoting Daimler AG v. Bauman*, 571 U.S. 117, 139 n. 19 (2014)) (emphasis added); *In re Lane*, No. 22 MISC. 34 (LGS), 2022 WL 16737132, at *2 (S.D.N.Y. Nov. 7, 2022) (holding that respondents headquartered in Manhattan reside or are found under Section 1782).

Respondents Goldman Sachs Group, Goldman Sachs, and Santander have their principal place of business in this District. CHIPS and FED are incorporated in this District. Accordingly, this statutory factor is satisfied.

      2.     *The Discovery Sought Is For Use In Foreign Proceedings.*

The information sought in the proposed Subpoenas is "for use" in foreign proceedings. At the outset, the Foreign Proceedings qualify as proceedings in a "foreign or international tribunal" for purposes of Section 1782. Indeed, numerous courts have found that civil proceedings (including enforcement proceedings) before Brazilian courts satisfy Section 1782's requirements.

*See, e.g.*, *In re Banco Sistema S.A.*, No. 23 MISC. 240 (AT), 2023 WL 5210973, at *1 (S.D.N.Y. Aug. 14, 2023) (authorizing §1782 discovery for use in Brazilian enforcement proceeding to locate assets of debtor); *In re Klein*, No. 20-MC-203 (PKC), 2022 WL 14786787, at *1 (S.D.N.Y. Oct. 26, 2022) (authorizing §1782 discovery for use in Brazilian probate and inventory proceedings relating to "a long-running, intra-family dispute about which assets should properly be included in the estate of the [testator]"); *In re Pimenta*, 942 F. Supp. 2d 1282 (S.D. Fla. 2013) (authorizing 1782 discovery for use in secondary estate distribution proceeding in Brazil probate court); *In re Lane*, No. 22 MISC. 34 (LGS), 2022 WL 16737132, at *2 (S.D.N.Y. Nov. 7, 2022) (authorizing 1782 discovery to, inter alia, determine the location of partnership assets, for use in Brazilian civil proceedings). [50] Likewise, Petitioners' requested discovery is "for use" in the Foreign Proceedings. Under Second Circuit law, the Petitioners are not required to show that the information sought would be discoverable or admissible in the Foreign Proceedings. *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 82 (2d Cir. 2012) ("[A]s a district court should not consider the *discoverability* of the evidence in the foreign proceeding, it should not consider the *admissibility* of evidence in the foreign proceeding in ruling on a section 1782 application."). Rather, the Petitioners only need to show that it has "the *practical ability* . . . to place a beneficial document—or the information it contains—before a foreign tribunal." *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 131 (2d Cir. 2017). The Petitioners plainly satisfies this requirement here. As explained above, and in the Bayeux Declaration, the information sought in the Subpoenas is highly material

---

[50] Further, the Foreign Proceedings are adjudicative proceedings "in a foreign or international tribunal" for purposes of Section 1782 because, the Brazilian courts overseeing the Brazilian proceedings are first instance decision-makers tasked with resolving evidentiary disputes, collecting and reviewing evidence in order to resolve those disputes, and permitting certain of its decisions to be appealed and become subject to further review. *Intel*, 542 U.S. at 257, 259.

and relevant to the Foreign Proceedings.[51]  The Petitioners seek discovery through this Application for use in the Foreign Proceedings in two ways: first, to identify assets of the debtors that may be brought to the Brazilian courts' attention for possible satisfaction of the debts; and second, to identify and prove any fraudulent transfers that Mr. Pope, his companies, or employees/agents thereof may have made and that can be used to satisfy the debt.[52]

> 3.    *Petitioners Are "Interested Persons."*

Finally, Section 1782 requires persons seeking discovery to show that they possess a reasonable interest in the foreign proceedings.  While Section 1782 broadly covers those with the right to participate and submit evidence in foreign proceedings, *see Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 120 (2d Cir. 2015), there is "[n]o doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782."  *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 256 (2004).  The Petitioners are the plaintiffs in the Foreign Civil Proceedings and are therefore an "interested person" under Section 1782.

**C.    All Of The Discretionary Factors Of Section 1782 Weigh In Favor of Permitting The Discovery Petitioner Seeks.**

Each of the *Intel* factors weighs in favor of granting the requested discovery.  *First*, the Respondents are not parties to the Foreign Proceedings.  *Second*, there is no reason to believe that the Brazilian courts would be unreceptive to evidence obtained through Section 1782 discovery.  To the contrary, there's already evidence that they will be receptive to the evidence sought here.  *Third*, the Petitioners are acting in good faith and are not seeking to avoid any foreign restriction

---

[51]  Bayeux Decl., ¶58.
[52]  Bayeux Decl., ¶57.

on gathering evidence.  *Fourth*, Petitioners' narrowly-tailored document requests evidence from Respondents are carefully circumscribed and targeted to key facts so as to avoid undue burden on them.

>    *1.    The First Intel Factor Favors Granting Discovery Because Respondents Are Not Parties to the Foreign Proceedings.*

The first *Intel* factor asks whether the party from whom discovery is sought is a party to the foreign proceeding.  "[W]hen the person from whom discovery is sought is a participant in the foreign proceeding  . . . the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad."  *Intel*, 542 U.S. at 264.  Here, the Respondents are not parties to the Foreign Proceedings and are beyond the subpoena powers of Brazilian courts.[53]  Because none of the Respondents are Brazilian entities, neither the São Paulo State Court nor the Brazilian Criminal Authority have jurisdiction to compel the Respondents to produce documents.[54]  Additionally, the Respondents are not and will not be parties to the Brazilian Judicial Reorganization Proceeding or the Brazilian Civil Proceedings, and the Respondents are not targets of the Brazilian Criminal Proceeding.[55],[56]

The first *Intel* factor therefore weighs in favor of discovery.

>    *2.    The Second Intel Factor Favors Granting Discovery Because the Brazilian Courts Will Be Receptive to the Requested Discovery.*

Under the second *Intel* factor, this Court should look to whether the foreign tribunal would be receptive to evidence obtained through Section 1782.  *See In re Application of OOO*

---

[53]  Bayeux Decl., ¶¶77-78.

[54]  Mr. Pope has not responded to any enforcement proceedings filed by financial institutions such as the Petitioners, and he may have left the country. The Brazilian courts and Brazilian Criminal Authority therefore likely will not be able to exercise jurisdiction over him.  *See* Bayeux Decl., ¶80.

[55]  Bayeux Decl., ¶75.

[56]  *See also* Bayeux Decl., ¶81.

*Promnesftstroy*, No. M 19-99(RJS), 2009 WL 3335608, at *7 (S.D.N.Y. Oct 15, 2009) (describing the second *Intel* factor as inquiring into whether the foreign proceeding would "*reject* evidence obtained with the aid of section 1782"). There is a strong presumption that the foreign tribunal will be receptive to evidence obtained in the United States, with the Second Circuit holding that "[a]bsent specific directions to the contrary from a foreign forum, the statute's underlying policy should generally prompt district courts to provide some form of discovery assistance." *Euromepa, S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1102 (2d Cir. 1995). A court should deny discovery on the basis of lack of receptiveness only where it is provided with "*authoritative proof* that [the] foreign tribunal would reject evidence obtained with the aid of section 1782." *Id.* at 1100 (emphasis added). *See In re Safra*, 2022 WL 3584541, at *5 ("objection to U.S. federal-court judicial assistance would have to come from an official source, such as an agent of the [foreign] government."); *Schmitz*, 376 F.3d at 84 (district court denied discovery request where German Ministry of Justice and local German prosecutor explicitly asked district court to deny it).

The Brazilian courts will be receptive to evidence obtained through this Application.[57] Indeed,[58] Courts in Brazil regularly accept evidence that is obtained by way of Section 1782 discovery in the United States, and they regularly accept it from parties in a similar position than the Petitioners in the Brazilian Judicial Reorganization Proceeding (creditor) or in the Brazilian Civil Proceedings (plaintiff). The Brazilian Criminal Authority likewise would receive all relevant

---

[57] Bayeux Decl., ¶¶80-81.

[58] Hence, the potential discovery of fraudulent diversion of resources perpetrated by Mr. Pope may not only lead to his conviction for the crime of fraud against creditors set forth in Article 168 of Brazilian Federal Law No. 11,101, but it could also entail significant implications for the credits held by the Petitioners and for all creditors of the SouthRock Group's companies undergoing judicial reorganization, insofar as any assets belonging to these companies might also be used to satisfy their debts. Bayeux Decl., ¶71.

evidence obtained from the 1782 Application, particularly where, as here, it is offered by the victim who commenced the criminal investigation.[59]

Accordingly, the second *Intel* factor weighs in favor of discovery.

> 3.   *The Third Intel Factor Favors Granting Discovery Because The Application Is Made in Good Faith and Does Not Circumvent Any Proof-Gathering Restrictions.*

The third *Intel* factor looks to "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 265.  The *Intel* Court expressly rejected the notion that Section 1782 requires that the evidence sought must be discoverable in the foreign proceeding itself, and the Second Circuit has added that the specific documents or testimony discovered need not be admissible abroad.  *See Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 82 (2d Cir. 2012) ("While *Intel* concerned the discoverability of evidence in the foreign proceeding, we see no reason why it should not extend to the admissibility of evidence in the foreign proceeding.  As in *Intel*, there is no statutory basis for any admissibility requirement."); *Intel*, 542 U.S. at 261 ("A foreign nation may limit discovery within its domain for reasons peculiar to its own legal practices, culture, or traditions—reasons that do not necessarily signal objection to aid from United States federal courts.").  Nor is there any requirement that Petitioner must exhaust his remedies in the foreign court first.  *See In re Application for an Order Permitting Metallgesellschaft AG to take Discovery*, 121 F.3d 77, 79 (2d Cir. 1997) ("[A] 'quasi-exhaustion requirement' finds no support in the plain language of the statute and runs counter to its express purposes.").

---

[59]   Under Brazilian Criminal Law, the victim has the right to present and use evidence in their favor, which means that any facts or evidence that come to light within the 1782 Application may be used to support Petitioners' case or contradict the accused's version. *See* Bayeux Decl., ¶¶78-81.

Here, there is no reason to believe that any of the discovery sought violates any foreign laws and/or public policy. Indeed, Brazilian laws do not prohibit the collection of information sought via this Application.[60]

Accordingly, the third *Intel* factor weighs heavily in favor of granting Petitioners' Application.

>    4.    *The Fourth Intel Factor Favors Granting Discovery Because The Requests Are Narrowly-Tailored and Proportional To The Needs Of The Foreign Proceedings.*

The fourth *Intel* factor looks to whether the requests are "unduly intrusive or burdensome." *Intel*, 542 U.S. at 265. The standard is substantially the same as in ordinary domestic civil litigation under the Federal Rules of Civil Procedure. "The reference in § 1782 to the Federal Rules suggests that under ordinary circumstances the standards for discovery under those rules should also apply when discovery is sought under the statute." *In re Bayer AG*, 146 F.3d 188, 195 (3d Cir. 1998).

Here, the document requests for each Respondent are narrowly tailored and directly relevant and proportional to the issues in the foreign proceedings.[61] Moreover, if Respondents reasonably believe that any documents present any confidentiality concerns, the Petitioners are willing to consider accommodating such concerns, such as by stipulating to a protective order. *See, e.g. Minatec Fin. S.A.R.L. v. SI Group Inc*., No. 1:08-cv-269 (LEK/RFT), 2008 WL 3884374, at *1 (N.D.N.Y. Aug. 18, 2008) ("[T]he beauty of § 1782 is that it permits this Court to impose a

---

[60]   Bayeux Decl., ¶¶81-82.
[61]   The Petitioners seek records that the Petitioners have identified from the financial statements of SouthRock Brazil and/or the expert report from the Brazilian Judicial reorganization proceeding as either holding accounts, sending or receiving payments, and/or processing payments for Mr. Pope and/or his companies that are incorporated in the United States and Brazil, and that were involved in the operations of Starbucks in Brazil. *See* Bayeux Decl., ¶58.

protective order that would extinguish any concern that privileged, confidential, or proprietary information would be indecorously revealed.")

Accordingly, the fourth *Intel* factor weighs heavily in favor of granting the Petitioners' Application.

## III.   CONCLUSION

For the foregoing reasons, the Petitioners respectfully requests that the Court (a) grant the *Ex Parte* Application And Petition For An Order To Conduct Discovery; (b) enter the Proposed Order attached as Exhibit B, (c) authorize the Petitioners, pursuant to 28 U.S.C. § 1782, to serve the Subpoenas on Respondents; and (d) grant any and all other relief to Petitioner as deemed just and proper.

Dated: January 9, 2024                          Respectfully submitted,

**/s/Gabriela Menna Barreto Scanlon**
MB SCANLON PLLC
4301 50th Street NW, 1st Floor
Washington, D.C., 20016
Phone:  (215) 459-1171
gabriela@mbscanlon.com